113 So.2d 808 (1959)
Ben DEGEYTER, Plaintiff-Appellant,
v.
Chester J. TRAHAN et al., Defendants-Appellants.
No. 4821.
Court of Appeal of Louisiana, First Circuit.
June 24, 1959.
Kaliste Saloom, Jr., Phil Trice, Lafayette, for plaintiff-appellant.
Davidson, Meaux, Onebane & Nehrbass, Lafayette, for defendants-appellants.
Before LOTTINGER, TATE and HOOD, JJ.
HOOD, Judge ad hoc.
This is an action for damages instituted by Ben Degeyter against Chester J. Trahan, *809 L. A. Frey & Sons, Inc., and Liberty Mutual Insurance Company, arising out of a motor vehicle collision between an automobile owned and being driven by plaintiff, Ben Degeyter, and a truck owned by L. A. Frey & Sons, Inc., and being driven by Chester J. Trahan. At the time the accident occurred Trahan was employed by L. A. Frey & Sons, Inc., and was driving the truck in the course of his employment. Liberty Mutual Insurance Company was the public liability insurer of the truck at that time.
Plaintiff contends that the sole and proximate cause of the accident was the negligence of defendant Trahan in the operation of the Frey truck. Defendants deny any negligence on the part of Trahan and in the alternative specially plead contributory negligence on the part of plaintiff. After trial of the case, judgment was rendered by the trial court in favor of plaintiff awarding him damages in the aggregate sum of $1,741.23. From this judgment both plaintiff and defendants have appealed.
The evidence establishes that this accident occurred about 5:30 A. M., on April 23, 1957, on U. S. Highway 90, in Iberia Parish, about two or three miles west of the City of New Iberia. The highway at that point is a two lane, hard surfaced, heavily traveled thoroughfare, running east and west. Although the highway was straight at the scene of the accident, the point of impact was almost mid-way between two curves in the road, each of said curves being about one mile from the place where the collision took place. It had been raining, and at the time of the accident the highway was wet. It was daylight, but because of the weather conditions visibility was poor.
Immediately prior to the time the accident occurred, plaintiff was driving his car in a westerly direction, and defendant Trahan was driving his employer's truck in an easterly direction on U. S. Highway 90. Shortly after defendant negotiated the curve just to the west of the scene of the accident, he overtook and passed a tractortrailer which also was being driven in an easterly direction. After passing this vehicle, and upon reaching a point a few feet from plaintiff's approaching car, defendant caused his truck to turn sharply to its left in front of plaintiff's vehicle, and immediately thereafter the collision occurred. The right front portion of plaintiff's car struck the right side of the truck. As a result of this collision plaintiff was injured and both vehicles were damaged.
The drivers of the two vehicles do not agree as to how the accident occurred. Plaintiff testified that immediately prior to the collision he was driving in his right or in the westbound, lane of traffic at a speed of 40 or 45 miles per hour. He testified that he saw defendant's truck overtake and pass the tractor-trailer, and that after this maneuver was completed defendant's truck did not return completely to the eastbound lane of traffic, but straddled the center line of the highway as it approached plaintiff's car. When the two vehicles were between 50 and 100 feet apart, according to plaintiff's testimony, defendant's truck was then turned suddenly to its left into plaintiff's lane of traffic, and immediately thereafter the collision occurred. Plaintiff stated that when he saw that a collision was imminent he applied his brakes and slowed down, but that he stayed in his proper lane of traffic, and that the point of impact was in the north or westbound lane of traffic.
Defendant Trahan testified that after he overtook and passed the tractor-trailer, he returned to his right or eastbound lane. He then saw plaintiff's vehicle rounding the curve ahead of him, but he testified that after plaintiff had negotiated this curve, his car approached defendant's truck in plaintiff's left or the eastbound lane of traffic. He stated that when he first observed plaintiff's car in the wrong lane of traffic he thought plaintiff intended to make a left turn, and that defendant then began to apply the brakes of his truck. Trahan further testified that when the two vehicles *810 reached a point within a few feet of each other he saw that a collision was imminent, and in an effort to avoid an accident he turned his truck sharply to the left into and across the westbound lane of traffic. He states, however, that at the time he turned to the left plaintiff's vehicle was completely in Trahan's lane of traffic, and that the collision occurred in the eastbound lane, south of but near the center line of the highway.
According to plaintiff's version, therefore, plaintiff remained in his proper lane of traffic prior to the accident, and the collision occurred on the north side of the highway. Defendants, on the other hand, contend that plaintiff was in the wrong lane of traffic before and at the time of the accident, and that the point of impact was on the south side of the highway.
The trial judge concluded that the accident occurred substantially as related by plaintiff, and that the sole proximate cause of the accident was the negligence of defendant Trahan in the operation of his truck. The following language was used by the trial judge in his written reasons for judgment:
"It is defendant's contention that after passing the truck tractor-trailer unit that he re-entered his right travel lane (southern lane) and noting that the plaintiff was approaching in his lane, sought to avoid the collision by turning sharply to the left. Defendant testified that the oncoming car was in his lane of travel after executing a curve in the road. We think that this testimony cannot be substantiated for the reason that the particular curve referred to was approximately one mile from the scene of the wreck (the Court having visited the scene of the wreck with all parties of interest). Approximately one mile west of the scene of the accident is another curve. If plaintiff's car and defendant's truck were traveling at the same rate of speed, defendant's truck would have been in or near the western curve at the time plaintiff's car was executing the eastern curve. As previously stated, the accident occurred approximately one mile from each curve. The Court is satisfied that defendant's truck did not re-enter the right hand lane after executing the passing operation of the rather lengthy truck tractor-trailer, and that as a result of defendant's attempting to pass this vehicle an emergency was created and in attempting to extricate himself from the perilous situation, defendant's truck attempted to take the left hand or northern shoulder of the highway, which was the proximate cause of the collision. It is defendant's contention that plaintiff has failed to show that the emergency was created by defendant, it being their contention that the emergency was created by the plaintiff, who drove in the left hand or southern lane for approximately one mile before the actual collision. The Court is not in agreement with defendant's contention as the Court feels that the position of the vehicles at the time of the actual impact creates a presumption in favor of the plaintiff in this instance for the reason that plaintiff was in his proper lane, or to emphasize it further, that plaintiff was partially on the shoulder of his proper lane at the time of the actual collision. The Court is of the opinion that defendant driver's explanation is very weak and not supported by convincing evidence either parol or physical. It is for that reason that the Court is of the opinion that the proximate cause of the accident was negligence of defendant driver Trahan."
In our opinion the evidence supports the conclusions reached by the trial judge as to the manner in which the accident occurred. Leroy Stemley, the driver of the tractor-trailer which defendant had just overtaken and passed, testified that defendant returned almost completely to his *811 eastbound lane of traffic after passing the tractor-trailer, that defendant then "took a deep left dive" immediately before the collision occurred, and that the point of impact was in the north or westbound lane of traffic. He further testified that prior to the accident he did not see plaintiff's car in the eastbound lane. The State Trooper who arrived at the scene shortly after the accident occurred testified that he found debris on the north shoulder and on the north edge of the hard surfaced portion of the highway, indicating that the point of impact was on the north edge of the highway or in the westbound lane of traffic, as stated by plaintiff, rather than in the eastbound lane as testified to by Trahan. The testimony of these witnesses corroborates plaintiff's testimony as to the manner in which the accident occurred.
The evidence convinces us, as it did the trial judge, that plaintiff remained in his proper lane of traffic as he approached defendant's truck prior to the accident, and that the point of impact was partly on the north shoulder and partly on the north edge of the hard surfaced portion of the highway. Although Trahan endeavored to overtake and pass the tractor-trailer at a time when plaintiff's on-coming car was very close, the evidence appears to be uncontradicted to the effect that the Frey truck had completely passed the overtaken vehicle and could have returned to the south lane of traffic before the collision occurred if the driver had elected to do so. The accident obviously would have been avoided if that had been done, and actually since plaintiff's car was partly on the north shoulder of the highway at the time of the collision it appears that the accident might have been avoided if the Frey truck had simply continued to straddle the center line until it had passed plaintiff. We conclude, therefore, that defendant Trahan was negligent in suddenly turning the Frey truck to the left into the north or westbound lane of traffic immediately in front of plaintiff's car, and that his negligence in that respect was a proximate cause of the accident.
Defendants allege and contend that plaintiff was guilty of contributory negligence in a number of particulars. Most of these alleged acts of contributory negligence, however, are predicated on the assumption that prior to the accident plaintiff was driving in his left, or wrong, lane of traffic, and that the point of impact was in the eastbound lane. It is unnecessary to consider these allegations since we have concluded that plaintiff was in his proper lane and that the accident occurred on the north side of the highway. In addition to those particulars, however, defendants allege that plaintiff was negligent in driving while under the influence of intoxicating liquors, and in failing to exercise the last clear chance to avoid the accident after he saw or should have seen defendant's truck in its position of peril.
The evidence establishes that plaintiff had consumed two bottles of beer during the early morning hours prior to the accident, and that shortly after the accident occurred he had a strong odor of liquor on his breath and it was apparent to the investigating State Trooper that plaintiff had been drinking. This evidence may be sufficient to justify a conclusion that plaintiff was negligent in driving while under the influence of intoxicating liquor, but the evidence also shows that his negligence in that respect, if he in fact was negligent, was not a proximate cause of the accident. Plaintiff kept his car in his own proper lane of traffic prior to the accident, the Frey truck was turned suddenly to the left into plaintiff's lane directly in front of and just a few feet from his car, and the collision occurred at the northern edge of the highway, partly on the shoulder and partly on the north edge of the hard surfaced portion of the road. Under those circumstances it appears that the only thing plaintiff could have done to avoid the accident was to have brought his car to a stop before reaching the point where the collision occurred. Under the facts presented here, however, we feel that there was nothing to indicate to plaintiff *812 that such a precaution was necessary, because he had a right to assume that defendant would return to his proper lane of traffic, or at least that defendant would not turn suddenly to his left directly in front of plaintiff's car. We conclude, therefore, that if plaintiff in fact was driving his car while under the influence of intoxicating liquors, his negligence in that respect was not a proximate cause of the accident and does not bar him from recovering in this case. We further conclude that plaintiff did not have an opportunity to avoid the accident after he saw or should have seen defendant in his position of peril, and accordingly there is no merit to the argument that plaintiff had the last clear chance to avoid the collision.
Since the sole proximate cause of the accident was the negligence of defendant Trahan in the operation of the Frey truck, and plaintiff was free from contributory negligence, plaintiff is entitled to recover from defendants the damages he sustained as a result of that accident.
The evidence establishes that as a result of this accident plaintiff sustained a whiplash injury to the neck, with multiple contusions of the chest, back, abdomen and knees. There were no fractures, dislocations or sprains. He was treated by Dr. Phillip F. Purpera, who is engaged in the general practice of medicine, from April 24, the day after the accident occurred, until November 4, 1957. Plaintiff completely recovered from the whiplash injury and the contusions by June, 1957, or within a period of two months after the date of the accident. Plaintiff contends, however, that in August of that year, approximately four or five months after the accident occurred, he developed a rash on his upper and lower extremities, and since that time this rash has appeared periodically. He testified that since the accident he has suffered from this rash, from nervousness, periodic itching, inability to sleep and indigestion, all of which he attributes to the accident. He contends that the rash which he has is caused by this nervousness.
Dr. Purpera described the whiplash injury sustained by plaintiff as being "mild to moderate." He testified that plaintiff recovered from the whiplash injury and contusions by June, 1957, but that during the latter part of May he began having symptoms of nervousness and in August he developed a severe rash. Because of this rash Dr. Purpera referred plaintiff to a dermatologist in September. Upon being asked whether there was any causal connection between the accident and the rash which developed several months later, Dr. Purpera replied, "I would say it is possible." He further stated, however, that it is possible that the rash could be caused by "other things such as a dietary condition." He examined plaintiff again one week before the trial and his findings were negative as to physical injury, skin abnormality or nervousness. During the trial Dr. Purpera again examined plaintiff's arms and legs and testified that there was no rash present on them at that time. This is significant in view of the fact that plaintiff and a former roommate of his testified that the rash was present at the time of that examination, the latter witness stating that it was the same then as it had been for several months prior thereto.
Dr. Robinson, a dermatologist, examined plaintiff on September 18, 1957, and on May 16, 1958. On the first examination he found that plaintiff had acute urticaria, or hives, for which he treated him. He noted that plaintiff was nervous and emotional, and for that reason he referred him to a psychiatrist. On the second examination made on May 16, 1958, the doctor found no rash or hives, and he also examined plaintiff on the date of the trial and found that he was not affected by either of those conditions at that time. Upon being asked whether the rash of which plaintiff complained could be partially or wholly caused by the accident, he replied, "Not necessarily, but very possible." He further testified that there could be other causes of this rash. It appears from the testimony of Dr. Robinson that the condition *813 which he diagnosed as acute urticaria, or hives, and which was cured shortly after treatment was administered, was the same condition which Dr. Purpera had referred to as a "rash." Neither of these doctors apparently found plaintiff to be affected with any other rash or skin abnormality after that first incident.
Dr. W. L. Kirkpatrick, a specialist in neuropsychiatry, examined plaintiff on October 3, 7, and 9, 1957, and in May 14, 1958. He detected no rash on plaintiff's extremities on any of these examinations. He testified, however, that in his opinion plaintiff "was definitely suffering from a nervous disorder, neurosis, neurotic type reaction which apparently had been precipitated or at least seemed to be associated with the accident." He concluded that there was a definite relationship between the accident and the nervousness. This conclusion, however, was based largely on the history given to him by plaintiff, a significant part of such history being that plaintiff "was functioning at least in an average capacity" prior to the accident and that his present symptoms of nervousness developed after that time. He stated, however, that he did not know anything about plaintiff's condition prior to the accident and that he saw plaintiff only on the four occasions above mentioned. He further testified that during the trial of this case plaintiff appeared to be "relatively calm" or "relatively composed," and that he did not show any signs of nervousness at that time.
With reference to his condition prior to the accident, plaintiff testified:
"Q. Mr. Degeyter, were you nervous before the wreck? A. Not the condition I am in.
"Q. You were not nervous before the wreck? A. Everybody is nervous to a certain extent but not like I am in. This steering wheel hit me in the chest.
"Q. You did have some nervousness before the accident? A. Like ordinary person would before. At this time when food doesn't agree with you, you can't sleep something.
"Q. Did you take sleeping pills before the accident? A. No, not that I know of. Now and then when I feel nervous like anyone else I have a medicine chest at home, to calm your nerves.
"Q. You may have taken some sleeping pills before the accident. A. Yes, sir."
The trial judge concluded that plaintiff was not permanently injured, but that he did suffer "injury, discomfort and loss of earnings," for which the court awarded him the sum of $1,150. We concur with the trial judge that plaintiff sustained no permanent injuries. The evidence convinces us that the injuries which plaintiff did sustain consisted of a mild to moderate whiplash injury, with contusions of the chest, back, abdomen and knees, and that he completely recovered from these injuries within a period of two months. These injuries undoubtedly caused him to suffer pain for several weeks immediately following the accident, and we are convinced that since that time he occasionally has suffered mild pain in his neck. Plaintiff, however, has failed to establish a causal connection between the accident and the nervousness and rash of which he now complains.
Although the trial judge indicated in his reasons for judgment that the award of $1,150 was intended to compensate plaintiff for his "loss of earnings," as well as for his injuries and discomfort, we feel that the amount so awarded fairly and adequately compensates plaintiff for all of the injuries, pain and suffering which he sustained as a result of this accident.
The trial judge also awarded plaintiff the sum of $591.23 for medical and drug expenses incurred in the treatment of the injuries sustained by him. We find no *814 error in that portion of the judgment so rendered.
Plaintiff demands judgment in the sum of $2,400 for "loss of earnings to date," and for the additional sum of $6,000 for "future loss of earnings." Plaintiff stated that at the time of the accident he was employed to "run poker games, help around the place, manage the place when he (plaintiff's employer) wasn't there." With further reference to his employment, he testified:
"Q. What was the basis of your pay? How did you get paid? A. If we made money I would make something. I had no regular salary.
"Q. If you made money doing what? A. Playing poker. If business was good, I was paid.
"Q. If you made money playing poker you got paid; if you didn't make any money playing poker, you didn't get paid. A. That's right."
Plaintiff's demand for loss of earnings must be rejected for two reasons. First, the evidence fails to convince us that he was ever disabled because of these injuries from performing the duties of his employment. According to his own testimony he continued to go to his place of employment for three or four weeks after the accident, but discontinued doing so because there was "no more business, business was cut off." We interpret his testimony to be to the effect that he continued to perform the duties of his employment for that period of time following the accident, but that he quit or his employment was terminated because business was bad. Second, plaintiff has failed to establish the amount of his earnings. The only proof offered by him along that line was his own testimony in which he estimated his average weekly earnings prior to the date of the accident. His testimony was not corroborated or supported by any other evidence. The record discloses that his alleged employer was present in Court during the trial, but was excused without being called to testify. Certainly this employer could have verified some of plaintiff's statements if his estimate of earnings was substantially correct. His testimony, therefore, unsupported by other available proof, was more in the nature of an estimate than proof, and for that reason we conclude that he has failed to establish the amount of his earnings immediately prior to the accident. Horrell v. Gulf & Valley Cotton Oil Co., Inc., 16 La.App. 90, 133 So. 394; Jenkins v. A. R. Blossman, Inc., La.App., 60 So2d 131; Rhymes v Guidry, La.App., 84 So.2d 634.
Since we have concluded that plaintiff is not entitled to recover for loss of earnings because of the reasons above set out, it is not necessary to consider the additional argument advanced by defendants that loss of earnings cannot be considered as an element of damage in this case because of the nature of plaintiff's employment.
Plaintiff further demands judgment for the sum of $535 for "loss of automobile." The only evidence offered in support of this claim is the testimony of plaintiff to the effect that he purchased the car two weeks before the accident for the sum of $300, which he stated was paid in cash, plus a trade-in of his old car which he valued at not less than $300. He testified that after the accident he sold the wrecked car as salvage for the sum of $65, and a document purporting to be a receipt signed by plaintiff and the purchaser was introduced in evidence reciting that the car was sold as salvage for that amount on May 14, 1957, about three weeks after the accident occurred. The trial judge omitted from the judgment which he rendered any award for damages because of the alleged loss of plaintiff's automobile.
The evidence establishes that plaintiff's car was badly damaged as a result of this accident. Since there was no proof tending to support plaintiff's estimate as to the value of the car which he traded-in on the automobile which was wrecked, we *815 conclude that the evidence establishes only that plaintiff's car had a value of $300 prior to the accident, which was the cash portion of the purchase price. Shortly after the accident it was sold as salvage for $65. We conclude, therefore, that plaintiff sustained a loss of $235 because of damages to his automobile. The judgment rendered by the trial court should be amended to include an award for this additional amount.
For the reasons herein assigned, the judgment of the district court is amended by increasing the award in favor of plaintiff, Ben Degeyter, to $1,976.23, and as thus amended that judgment is affirmed. All costs of this appeal are to be paid by defendants-appellants.